712 A.2d 698 (1998)
313 N.J. Super. 55
STATE of New Jersey, Plaintiff-Respondent,
v.
Benjamin BLANKS, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued March 4, 1998.
Decided June 24, 1998.
*699 Stephen W. Kirsch, Assistant Deputy Public Defender, for defendant-appellant (Ivelisse Torres, Public Defender, attorney; Mr. Kirsch, of counsel and on the brief).
Bennett A. Barlyn, Deputy Attorney General, for plaintiff-respondent (Peter Verniero, Attorney General, attorney; Mr. Barlyn, of counsel and on the brief).
Appellant filed a pro se supplemental brief.
Before Judges KING, KESTIN and CUFF.
The opinion of the court was delivered by CUFF, J.A.D.
This appeal requires us to determine whether a defendant must admit using a weapon to intentionally kill the aggressor in the act of defending himself in order to be entitled to a self-defense instruction. We hold that, under the circumstances of this case, defendant was entitled to a self-defense charge even though he did not admit using his handgun in self-defense and intentionally killing the aggressor. Because of errors in the self-defense charge, as well as the charge concerning unlawful possession of the handgun and the omission of a charge on passion/provocation manslaughter, a new trial is required.
A jury convicted defendant Benjamin Blanks of the knowing or purposeful murder in violation of N.J.S.A. 2C:11-3a(1),(2) of Ronald Massey, the boyfriend of the daughter of his long-term paramour, and possession of a weapon (a handgun) for an unlawful *700 purpose in violation of N.J.S.A. 2C:39-4a. The trial judge merged the weapons conviction with the murder conviction and imposed a life term with a thirty-year period of parole ineligibility. The usual penalties and assessments were also imposed.
On appeal, defendant raises the following points:
POINT I
SINCE DEFENDANT WAS IN HIS OWN DWELLING AT THE TIME OF THE ENCOUNTER WITH THE DECEDENT, THE JUDGE SHOULD NOT HAVE CHARGED THE JURY THAT DEFENDANT HAD A DUTY TO RETREAT BEFORE USING DEADLY FORCE. (Not Raised Below).
POINT II
A JURY INSTRUCTION ON PASSION/PROVOCATION MANSLAUGHTER SHOULD HAVE BEEN GIVEN. (Not Raised Below).
POINT III
NO HARMON INSTRUCTION WAS GIVEN TO THE JURY ON POSSESSION OF A WEAPON FOR AN UNLAWFUL PURPOSE. (Not Raised Below).
In his supplemental pro se submission, the following points are argued:
POINT I
THE TESTIMONY OF ANDREA EFFINGER WHEREIN SHE STATED THAT DEFENDANT DID NOT LIKE THE VICT[I]M WAS OPINED TESTIMONY THAT LACK[S] FOUNDATION AND SHOULD HAVE BEEN STRICKEN FROM THE RECORD TO AVOID POSSIBLE PREJUDICE TO THE JURY AND DEFENDANT'S RIGHT TO A FAIR AND IMPARTIAL TRIAL.
POINT II
APPELLANT'S SIXTH AMENDMENT RIGHTS UNDER THE UNITED STATE[S] AND NEW JERSEY CONSTITUTION W[ERE] VIOLATED BY TRIAL COUNSEL.
Due to errors in the jury instructions which had the clear capacity to produce an unjust result, we reverse the convictions and remand for a new trial. In light of this disposition, we need not reach defendant's pro se supplemental arguments.
On September 24, 1994, twenty-four year old Massey was killed by a single gunshot wound to his head. At the time he was killed, Massey was visiting his girlfriend Andrea Effinger (Andrea), and their child, Rahmael. Andrea and Rahmael lived in a four-bedroom apartment in Hoboken with Andrea's mother, Rinda Effinger (Rinda); Andrea's sisters, Latoya and Shauntee Effinger; defendant; Rinda's son, Anthony Effinger; and Rinda and defendant's son, Jason. Defendant and Rinda had lived together for many years and shared a bedroom in the apartment.
At the time of the shooting, Andrea had dated Massey for a year and a half; their son was five months old. Massey visited her every day at the apartment. According to Andrea, defendant did not like Massey. Andrea drew this conclusion from "[t]he way [defendant] used to act towards [Massey]."
According to Andrea, Massey arrived at the apartment at approximately 10 p.m. Everyone, except defendant, was home at the time. Soon after his arrival, Massey went into the kitchen to make himself something to eat. At approximately 10:30 p.m., Andrea went into the kitchen where she observed Massey cooking eggs. While Andrea was in the kitchen talking to Massey, defendant came home, looked into the kitchen, walked down the hallway to his room and slammed the door. Defendant said nothing to anyone, and Andrea expressed surprise to Massey that defendant "didn't start tonight."
Andrea then went to check her son. After about a minute, Andrea saw defendant walk past her room on his way to the kitchen. A few seconds later, Andrea heard a "pow." Her mother and sister screamed, "Oh my God, Ben shot Ron." Andrea ran to the kitchen and saw Massey lying on the kitchen floor.
When Andrea got to the kitchen, defendant was in the hallway, walking back to the bedroom. Defendant had a gun in his hand and was waving it around. Andrea jumped *701 on defendant. Anthony, who had been asleep in his bedroom, was awakened by the sound of the shot. He came out of his room and joined in the scuffle in an attempt to get the gun away from defendant. Eventually, defendant freed himself from Anthony and Andrea, walked into his room, put the gun away and returned to the hallway. Shortly thereafter, a housing authority police officer entered the apartment and arrested defendant.
According to Andrea, Anthony and Shauntee, defendant was intoxicated at the time of the incident. Shauntee saw defendant enter the kitchen and say to Massey, "I told you that I didn't want you here." She heard Massey say "all right" and she heard a bang "[r]ight after Ron said `all right.'" Shauntee went into the kitchen and saw Massey lying on the floor. Shauntee did not witness the actual shooting. She does not know whether Massey moved toward defendant or punched defendant.
Defendant testified in his defense. According to defendant, he had the loaded gun with him all day, although he never carried the gun on his person at any other time except when he went fishing. The gun was not registered and defendant did not have a permit for the gun, even though he knew it was illegal to carry a gun without a permit.
Defendant testified that he carried the gun with him that day because someone broke the lock on the cabinet where he kept the gun and he was afraid the children would find it. Although he stored the gun unloaded, defendant loaded the gun that day because Anthony had been robbed just two days before, and defendant was to pick up receipts from a social club on that date.
Defendant carried the gun in the front right pocket of his denim pants. He testified that the gun could not be seen while inside his pants and that the pants fit comfortably with the gun in the pocket.
Defendant related that he attended the funeral of a friend that day and arrived at a social club after 3:30 p.m. While there, he consumed "three or four" beers and "[m]aybe a half-pint" of brandy. Defendant is a diabetic; therefore, when he arrived home, he went directly to his room to inject himself with insulin. Defendant did not remember looking into the kitchen when he got home that night. However, he did recall seeing Andrea, Latoya, Shauntee and Rinda.
When he entered the kitchen, defendant recalled that he saw Massey and said to him something like, "I thought I told you not to come here." According to defendant, Massey was belligerent, stepped close to defendant and punched him in the face. Defendant testified that he has had "four bypass surgeries" and that one punch could kill him. Defendant testified that he reacted immediately to Massey's blow. He remembered trying to hit Massey back, but everything else "went blank." Defendant stated that he heard the shot and then noticed that he had the gun in his hand.
Defendant admitted that he had the gun in his hand after the shooting. However, he did not remember putting his hand into his pocket, taking the gun out of his pocket, cocking the gun or aiming the gun at Massey. He did not remember pulling the trigger. He could not explain how the gun discharged. He did recall that he walked to his bedroom and put the gun in the cabinet after the shooting.
According to defendant, he had no hard feelings for Massey. He admitted, however, that he did not want Massey in the apartment on the night of the incident. Defendant explained that he had the police put Massey out of the apartment on a prior occasion because Massey always smelled of marijuana, and defendant did not want drugs in his home.

I
Defendant requested and received a self-defense charge. He argues, however, that the charge was erroneous because the jury was informed that defendant had a duty to retreat. The State concedes that the trial judge should not have instructed the jury that defendant had a duty to retreat. Nevertheless, it argues that the error is harmless. First, the State emphasizes that defendant failed to object at trial and the error does not constitute plain error. Second, the State *702 contends that the self-defense charge was wholly unwarranted because defendant never admitted that he shot Massey.
The erroneous segment of the self-defense instruction is the following statement:
If you find that the defendant knew that he could avoid the necessity of using deadly force by retreating, provided that the defendant knew he could do so with complete safety, then the defense is not available to him.
A person need not retreat if the person is attacked in his or her home by someone who is not a cohabitant. N.J.S.A. 2C:3-4b(2)(b)(i); State v. Gartland, 149 N.J. 456, 467, 694 A.2d 564 (1997). Massey did not reside in the apartment. We need not decide whether Massey's status as a frequent visitor altered his status to that of a cohabitant for purpose of the retreat doctrine. See State v. Felton, 180 N.J.Super. 361, 365, 434 A.2d 1131 (App.Div.1981).
Rule 2:10-2 permits an appellate court to consider a previously unchallenged jury instruction only if any error constitutes plain error. State v. Chew, 150 N.J. 30, 82, 695 A.2d 1301 (1997). Under plain error review, a defendant must establish three things: (1) there was error; (2) the error was clear or obvious; and (3) the error affected substantial rights. In other words, the error must have affected the outcome. United States v. Olano, 507 U.S. 725, 734, 113 S.Ct. 1770, 1778, 123 L. Ed.2d 508, 519 (1993); Chew, supra. The plain error test is "whether the possibility of injustice is `sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. G.S., 145 N.J. 460, 473, 678 A.2d 1092 (1996) (quoting State v. Macon, 57 N.J. 325, 336, 273 A.2d 1 (1971)).
With respect to jury charges, "[e]rroneous instructions on matters or issues that are material to the jury's deliberation are presumed to be reversible error in criminal prosecutions." State v. Jordan, 147 N.J. 409, 422, 688 A.2d 97 (1997). However, if the evidence does not support the charge, then any error in the charge is harmless. State v. Reyes, 140 N.J. 344, 361, 366, 658 A.2d 1218 (1995).
Defendant did not directly admit that he shot Massey. Defendant testified that Massey turned and punched him, that he feared for his safety, and that "[e]verything went blank," although he remembered trying "to hit [Massey] back, and this [is] when I heard the shot, you know." On the other hand, he did not deny shooting Massey. He acknowledged that the gun was in his hand and that no one else could have shot Massey.
We have found no New Jersey case which addresses the issue of whether a defendant may claim self-defense if he does not admit using the weapon in self-defense and intentionally killing the aggressor. State v. Johnston, 257 N.J.Super. 178, 608 A.2d 364 (App. Div.), certif. denied, 130 N.J. 596, 617 A.2d 1219 (1992), is most nearly on point.
In Johnston, defendant's wife was found dead in the woods. Id. at 182, 608 A.2d 364. Although the facts are not clearly set forth in the opinion, the wife apparently attacked defendant first with a knife. Id. at 195, 608 A.2d 364. Defendant tried to knock the knife from his wife's hand with a hammer, but she continued the attack whereupon defendant lost control and blacked out. Ibid. The wife sustained more than 29 injuries, including a skull that was fractured in five places. Id. at 183, 608 A.2d 364. The county medical examiner determined that the wife's injuries were consistent with an attack by a hammer. Ibid. We held that the trial court properly charged the jury as to self-defense. Id. at 195, 608 A.2d 364.
Even though defendant, like Johnston, testified that he blacked out, Johnston is not necessarily applicable because there defendant admitted to using the hammer in his effort to ward off the attack. Here, defendant did not admit to using the gun to ward off Massey's attack. Instead, defendant testified that in the course of trying to hit back, he blacked out, and he could not recall removing the gun from his pocket or discharging the gun.
The jurisdictions that have considered the issue of whether one must admit to intentionally killing the victim in order to be entitled *703 to a self-defense charge are split. The majority of jurisdictions hold that self-defense requires intentional conduct. Lacy v. State, 629 So.2d 688, 689 (Ala.Crim.App.) ("claim of self-defense necessarily serves as an admission that one's conduct was intentional"), cert. denied, 629 So.2d 691 (Ala.1993); People v. Curtis, 30 Cal.App.4th 1337, 37 Cal.Rptr.2d 304, 316-17 (1994) (defendant who "denied intending to shoot anybody" and "claimed the rifle went off accidentally" not entitled to self-defense charge because self-defense and accidental homicide are mutually exclusive), cert. denied, 516 U.S. 948, 116 S.Ct. 391, 133 L. Ed.2d 312 (1995); Ferrell v. State, 60 Md.App. 459, 483 A.2d 777, 779 (1984) ("defense of self-defense when deadly force is employed involves the conscious decision to employ that force"), aff'd, 304 Md. 679, 500 A.2d 1050 (1985); People v. Heflin, 434 Mich. 482, 456 N.W.2d 10, 19 (1990) ("justifiable self-defense necessarily requires a finding that the defendant acted intentionally"); State v. Isom, 906 S.W.2d 870, 873 (Mo.Ct.App.1995) ("concept of self-defense implies an act which is intentional rather than reckless or accidental"); State v. Gray, 347 N.C. 143, 491 S.E.2d 538, 546 (1997) ("self-defense involves an intentional act"; and, therefore, when evidence shows that shooting was accidental, defendant is not entitled to a self-defense charge), cert. denied, ___ U.S. ___, 118 S.Ct. 1323, 140 L.Ed.2d 486 (1998); see also, e.g., State v. Pugliese, 122 N.H. 1141, 1146, 455 A.2d 1018, 1021 (1982) ("defendant asserting ... self-defense... tacitly admits the killing was intentional"); McGhee v. Commonwealth, 219 Va. 560, 248 S.E.2d 808, 810 (1978) ("defense that a killing was accidental presents a different issue from a claim that a killing was done in self-defense").
Indiana and Pennsylvania have held that self-defense encompasses both intentional and accidental killings. Shackelford v. State, 486 N.E.2d 1014, 1016 (Ind.1986) ("self-defense may be asserted when the accused exerts proper force against the assailant whose death resulted accidentally"); Commonwealth v. McFadden, 402 Pa.Super. 517, 587 A.2d 740, 742 (1991) (a self-defense charge is appropriate in cases involving accidental injury when the accidental injury or death occurred while defendant was defending himself).
In Illinois, the courts go both ways. Sometimes a defendant is entitled to a self-defense charge even if the killing is claimed to be an accident. People v. Robinson, 163 Ill.App.3d 754, 114 Ill.Dec. 898, 516 N.E.2d 1292, 1299 (1987), appeal denied, 119 Ill.2d 570, 119 Ill.Dec. 394, 522 N.E.2d 1253 (1988). Other times a defendant is not. The Robinson court explained the issue:
Courts in Illinois and elsewhere appear divided as to whether a self-defense instruction is proper when a defendant testifies that a homicide ... was accidental. The question has been posed in a more limited alternative form: whether such an instruction is proper when not only the defendant testifies to accident but also no other evidence of self-defense is in the record. Courts that refuse a self-defense instruction in such circumstances have done so at least partly on the ground that the defense of self-defense conflicts with that of accident. Yet, such cases disclose a `false conflict,' in that no self-defense was actually shown on the facts, thus justifying no instruction thereon that could contradict an accident theory in the first place.
The apparently divided judicial opinion, in other words, can be explained by factual differences among the cases as to (1) whether all a defendant's acts immediately preceding the charged injury were alleged by the defendant to be accidental or nonforcible..., or (2) whether only the result itself was allegedly accidental while the preceding acts were alleged to be intentionally forcible and self-defensive.... In the first situation, which completely lacks intent or force prior to the injury, a defendant will understandably be held not to have shown self-defense, and a self-defense instruction ought to be precluded regardless of whether the resulting injury is `contradictorily' termed accidental. In the second situation, which involves intentional self-defense though unintended result, the intentional acts are the basis for a self-defense theory and instruction, but only for the purpose of supporting the ultimate *704 defense theory of accident as to the charged injury.

[Robinson, supra, (citations omitted).]
"False conflict" cases involve factual scenarios where the defendant testified that he used no force (i.e., the victim walked into the knife). Id., 114 Ill.Dec. 898, 516 N.E.2d at 1300; see People v. Tanthorey, 404 Ill. 520, 89 N.E.2d 403, 406 (1949) (gun somehow discharged when defendant flung up his hand in an attempt to ward off an attack).
In cases where the defendant was entitled to a self-defense charge despite the claim that the killing was an accident, "the defendant relied on an accident theory as to the ultimate injury and a self-defense theory as to his preceding acts." Robinson, supra, 114 Ill.Dec. 898, 516 N.E.2d at 1303; see People v. Buchanan, 91 Ill.App.3d 13, 46 Ill.Dec. 540, 414 N.E.2d 262, 264 (1980) (shooting occurred during and as a result of the struggle and was in that sense accidental, but the preceding events could place the shooting in the context of self-defense). Thus, "evidence of self-defense immediately preceding the alleged accident distinguishes the instant case from others in which no such evidence had been offered and the refusal of a self-defense instruction was upheld." Robinson, supra, 114 Ill.Dec. 898, 516 N.E.2d at 1305. These cases, however, do not address the situation where the defendant intentionally shoots the victim but does not remember, or will not admit, that a weapon was used against the aggressor.
Only Pennsylvania has considered the issue of whether self-defense may be charged when the defendant cannot or will not admit shooting the victim. In Pennsylvania, a self-defense charge does not require an admission that the defendant purposely fired the weapon at the victim. McFadden, supra, 587 A.2d at 744; Commonwealth v. Mayfield, 401 Pa.Super. 560, 585 A.2d 1069, 1078 (1991) (en banc).
In Mayfield, defendant was convicted of aggravated assault and possession of instruments of crime as the result of a fight in which he had participated. Mayfield, supra, 585 A.2d at 1070. During the fight, the victim was bitten and stabbed. Ibid. When defendant testified, he admitted only that he bit the victim and pulled out a knife. Ibid. Defendant denied stabbing the victim. Ibid. Instead, defendant testified that when he pulled the knife, the victim ran away. Ibid.
Defendant argued on appeal that the judge should have charged the jury on self-defense. Ibid. The Commonwealth argued that defendant was not entitled to a self-defense charge because he did not admit stabbing the victim. Id. at 1077. The court framed the issue as whether defendant was entitled to a self-defense charge even though he "denied committing the act for which he was convicted" (i.e., stabbing the victim). Id. at 1070. In its analysis, the court first noted that before a defendant is entitled to a self-defense charge, three things must be established: (1) defendant did not provoke or continue the "difficulty" that resulted in the homicide; (2) defendant "reasonably believed that he was in imminent danger of death or great bodily harm, and that there was a necessity to use such force in order to save himself therefrom"; and (3) defendant did not violate any duty to retreat or to avoid the danger. Id. at 1071. The court found that defendant never denied using deadly force (which in Pennsylvania includes the mere brandishing of a knife) but rather denied only that he caused the victim's injury. Id. at 1077. The court observed that "[i]t is the specific denial of the use of deadly force for one's own protection which precludes the claim of self-defense." Id. at 1074 (emphasis added). Because defendant never denied pulling the knife, "but merely has denied causing the injury ... once he pulled his knife," and because he never "denied that he produced the deadly weapon with intent to use it in his own defense," defendant was entitled to the charge. Id. at 1077-78.
In McFadden, defendant shot and killed her estranged husband during a struggle over a gun. McFadden, supra, 587 A.2d at 743. Defendant had borrowed the gun from a friend because her husband had been threatening her. Ibid. When the husband came to the home to make good on his threats, he started hitting defendant and took the gun from her. Ibid. Defendant then grabbed the gun from him because she knew it was loaded; a struggle ensued; the *705 husband let go; defendant fell back with the gun in her hand, and it went off. Ibid. Defendant did not remember where she had pointed the gun or whether her finger was on the trigger at the time she fell back and the gun went off. Id. at 744. Although defendant denied intentionally shooting her husband, she did testify that she feared for her life; that she did not provoke her husband's rage; and that she had no opportunity to retreat. Id. at 743.
The McFadden court held that defendant was entitled to a self-defense charge despite the fact that she did not admit that she purposely fired the weapon at her husband because her testimony did not negate the elements of self-defense. Id. at 744. According to the court, the defendant was not required to admit that she had "fired the weapon purposefully." Ibid. The court noted that defendant's "testimony satisfied the three conditions precedent for submission of a self-defense claim to the jury except that she denied intentionally shooting the victim." Ibid.
None of the cases cited or discussed above is squarely on point, and the question remains whether New Jersey law requires a defendant's own admission that he or she intentionally killed the victim before the self-defense justification can be placed before the jury. In this case, we need not resolve the analytical split or harmonize the disparate theories on the need for an admission of intentional conduct because there are sufficient facts in the record to support a finding that defendant acted purposely and aggressively to protect himself from the victim's violent act.
The trial judge must charge the jury on self-defense "if there exists evidence in either the State's or the defendant's case sufficient to provide a `rational basis' for [its] applicability." State v. Bryant, 288 N.J.Super. 27, 35, 671 A.2d 1058 (App.Div.) (citing State v. Martinez, 229 N.J.Super. 593, 600, 552 A.2d 232 (1989)), certif. denied, 144 N.J. 589, 677 A.2d 761 (1996); see also Johnston, supra, 257 N.J.Super. at 192, 608 A.2d 364. That the defendant failed to admit to intentionally killing Massey is not fatal to a claim of self-defense when the State's version supplied that intent. Here, the State alleged that defendant did indeed deliberately pull out his gun and shoot Massey. Defendant testified that the killing occurred in the course of defendant's doing something to ward off another, possibly fatal blow by Massey and to wound and disable him. Defendant conceded that he acted to repel Massey and did not deny that he shot him. Taken together, the jury could have reasonably concluded that, despite defendant's memory loss, his shooting of Massey was intentional but only to save his own life. Cf. State v. Nance, 148 N.J. 376, 689 A.2d 1351 (1997) (self-defense pursued by defendant despite his claim that the shooting was accidental). Therefore, defendant was entitled to the charge.
We also conclude that the imposition of the duty to retreat was plain error in that it may have "`led the jury to a result it otherwise might not have reached.'" G.S., supra, 145 N.J. at 473, 678 A.2d 1092 (quoting Macon, supra, 57 N.J. at 336, 273 A.2d 1). Moreover, the trial judge's factual summary in the course of his instructions suggested that defendant's claim of self-defense must fail if defendant could not, in fact, recollect shooting Massey. While it is likely the jury may have convicted defendant of murder based upon the State's case, it is just as likely that defendant's conviction was based upon the jury's rejection of his self-defense argument because, as the trial judge instructed, self-defense could not be considered if "defendant did not say that he fired the gun and did not say that he killed [Ron]" or because defendant did not retreat in the face of Massey's attack even though he was in his own home. In addition, the trial judge failed to instruct the jury that self-defense was available if it found defendant used the gun to ward off Massey, even if he did not intend the fatal result. Since these errors, singly or in combination, could have contributed to the conviction, the errors constitute plain error and the murder conviction must be reversed.

II
Defendant further contends that the trial judge omitted to deliver a passion/provocation manslaughter charge and this omission *706 denied him a fair trial. He acknowledges that he did not request this charge. In fact, his attorney agreed that the trial judge should not deliver this charge. Now, however, defendant argues that "the jury could obviously believe the defendant killed in response to the punch and did so without, in fact, cooling off." Indeed, defendant goes so far as to argue that a passion/provocation manslaughter charge should automatically be considered whenever a defendant claims self-defense and there is the possibility that the jury may find that the defendant overreacted to the victim's conduct. Moreover, defendant contends that the consequences of a failed self-defense strategy require the trial judge to scrutinize the record and decline to defer to the possibly misguided judgment of trial counsel.
We would be remiss if we did not express our concern about the invited error which seems to have occurred in this matter. Ordinarily, we would refuse to review this error because defense counsel expressly agreed that a passion/provocation instruction should not be delivered. See State v. Pontery, 19 N.J. 457, 471, 117 A.2d 473 (1955). We review this aspect of the charge only because other fundamental flaws in the charge require reversal and a new trial.
"Passion/provocation manslaughter is an intentional homicide committed under extenuating circumstances that mitigate the murder." State v. Robinson, 136 N.J. 476, 481, 643 A.2d 591 (1994). Passion/provocation manslaughter has four elements: (1) the provocation must be adequate; (2) the defendant must not have had time to cool off between the provocation and the slaying; (3) the provocation must have actually impassioned the defendant; and (4) the defendant must not have actually cooled off before the slaying. State v. Mauricio, 117 N.J. 402, 411, 568 A.2d 879 (1990). The first two criteria are objective; the second two, subjective. Ibid.
When deciding whether to give the charge, the trial judge must view the facts "in the light most favorable to the defendant." Id. at 412, 568 A.2d 879. In other words, it is only when the trial judge determines that "no jury could rationally conclude that the State had not proven beyond a reasonable doubt that the asserted provocation was insufficient to inflame the passions of a reasonable person ... [that] the trial [judge] should withhold the charge." Ibid.
Here, close scrutiny of the entire record demonstrates that a passion/provocation instruction should have been given. Defendant testified that the victim's attitude towards him was belligerent and that the victim punched defendant in the face. Furthermore, the record reveals that a long-handled cooking fork was found on the kitchen floor at the victim's side. This suggests that the victim may have brandished the fork and further provoked defendant. We are also persuaded that, based on this record, a properly instructed jury may reasonably have convicted defendant of passion/provocation manslaughter. This possibility requires us to recognize this omission in the charge as plain error.

III
Defendant testified that the handgun was in his possession throughout the day to protect the children in his home from discovering the gun in its unlocked container and to protect himself in the case of robbery. He argues that the charge of possession of a weapon for an unlawful purpose failed to inform the jury that possession of a weapon for self-protection or the protection of others constitutes a defense to the charge. Again, no objection was lodged at trial. We conclude that the charge as given was erroneous and that the error must be considered plain error. R. 2:10-2; State v. Harmon, 104 N.J. 189, 205, 516 A.2d 1047 (1986).
To convict a person under N.J.S.A. 2C:39-4a, the State must prove four elements:
(1) the object possessed was a `firearm' within the meaning of N.J.S.A. 2C:39-1(f); (2) the firearm was possessed by defendant as defined in N.J.S.A. 2C:2-1c; (3) the defendant's purpose in possessing the firearm was to use it against the person or property of another; and (4) the defendant *707 intended to use the firearm in a manner that was unlawful.
[State v. Diaz, 144 N.J. 628, 635, 677 A.2d 1120 (1996) (citing Harmon, supra, 104 N.J. at 212, 516 A.2d 1047).]
"[A] conviction based on the use of the weapon is not a required precondition to a conviction for the possessory offense." Diaz, supra, 144 N.J. at 636, 677 A.2d 1120. N.J.S.A. 2C:39-4a applies "only when an individual arms himself with the actual purpose of using the weapon against another in a criminal manner." Harmon, supra, 104 N.J. at 204, 516 A.2d 1047. "[I]f the accused's honest purpose in possessing and in continuing to possess a weapon is to use it for sport, precaution, or in a manner intended to cause no harm to another, then he may present that defense to the jury to counter the charge that he is guilty of possession for an unlawful purpose." Id. at 211, 516 A.2d 1047. Here, defendant testified that he carried the gun as a precautionary measure against two possibilities: (1) that his children would find the gun and play with it and (2) that he would be robbed. Neither of these reasons is unlawful. Id. at 205, 516 A.2d 1047.
In Harmon, the Supreme Court specifically ruled that the possession of a weapon as "a precautionary step against the possibility of attack" does not "constitute a purpose to commit a substantive crime." Ibid. The issue of unlawful possession turns on "the purpose for which defendant possessed the gun and not how he used it." State v. Mieles, 199 N.J.Super. 29, 41, 488 A.2d 235 (App.Div.), certif. denied, 101 N.J. 265, 501 A.2d 933 (1985). Thus, "[i]f an individual's possession of a firearm is motivated honestly by a self-protective purpose, ... no crime under section 39-4(a) has been committed; there is nothing to justify." Harmon, supra, 104 N.J. at 207, 516 A.2d 1047.
The charge delivered by the trial judge failed to reflect defendant's testimony that he was armed that day as a precaution. Moreover, defendant claimed that he acted in self-defense. The Model Criminal Jury Charges contain specific language to be charged to a jury when the defendant raises self-defense. Specifically, the charge reads in pertinent part:
Any lawful purpose would be a defense to the charge. For example, if the defendant believed (his/her) purpose was to lawfully use the firearm to protect (himself/herself) or another against the use of unlawful force, or to protect (his/her) property, then the defendant's conscious object and design was not to use the firearm in an unlawful manner, and the State has failed to carry its burden of proof on this element beyond a reasonable doubt.
[Model Criminal Jury Charges, Possession of a Firearm With a Purpose To Use it Unlawfully Against the Person or Property of Another, N.J.S.A. 2C:39-4a (Revised June 1995).]
The absence of this language rendered the charge given "clearly capable of misleading the jury as to the [required] state of mind" to convict defendant. Harmon, supra, 104 N.J. at 205, 516 A.2d 1047. Although the charge given addressed all of the requirements of N.J.S.A. 2C:39-4a, it did not specifically mention the fact that arming oneself as a precautionary step or to prevent harm to others is not a violation of the statute as expressly and repeatedly stated in Harmon. Id. at 204, 205, 207, 211, 516 A.2d 1047. The jury had no idea whether arming oneself as a precautionary measure is or is not a violation of N.J.S.A. 2C:39-4a and, therefore, could have found defendant guilty of the weapons offense even if it believed his reasons for carrying the gun with him that day. Because this error was clearly capable of producing an unfounded result, the weapons conviction must be reversed.
The convictions are reversed and the matter is remanded for a new trial.